## PEOPLE *v.* FLACK *et al.*

*(Court of Oyer and Terminer, New York County.* March 31, 1890.)

1. CRIMINAL LAW—NEW TRIAL—INTRUDERS IN JURY-ROOM.

   A verdict in a criminal case is not vitiated by the misconduct of a newspaper reporter in secreting himself in the jury-room, and remaining there, taking notes, during a portion of the time that the jury were deliberating, where it appears that he had no communication whatever with the jury, who were ignorant of his presence, and all the jurors make a strong affidavit that they were not influenced by the incident in the slightest degree.

2. SAME—OBJECTIONS WAIVED.

   On his discovery, the reporter was brought before the court, and his misconduct considered. Defendants were present with their counsel, and took part in the investigation, without objecting to the further consideration of the case by the jury, nor to the rendition of the verdict. *Held*, that they thereby waived the right to avail themselves of the incident as being ground for a new trial.

Motion for a new trial.

*John R. Fellows*, Dist. Atty., *John W. Goff, McKenzie Semple*, and *John D. Lindsay*, for the People. *Wm. A. Fullerton, Horace Russell*, and *John H. Bird*, for defendants.

BARRETT, J. Under section 463 of the Code of Criminal Procedure, a new trial can only be granted in the cases provided in section 465. The latter section confers upon the court power to grant such new trial when a verdict has been rendered against the defendant, by which his substantial rights have been prejudiced, in the cases specified in the seven subdivisions which follow. These seven subdivisions need not be quoted *in extenso*, for the reason that the incident upon which the present application is founded has no relation to any of these subdivisions, except, possibly, the fourth. There is no pretense

of any misconduct upon the part of the jury. Consequently, the third subdivision is inapplicable. The sole question is whether the verdict is vitiated by the misconduct of a stranger, and the only provision under which the discussion on this head is admissible is that embodied in the fourth subdivision. The latter reads as follows: "When the verdict has been decided by lot, or by any means other than a fair expression of opinion on the part of all the jurors." The burden of establishing prejudice to his substantial rights, and the fact that the verdict was reached by means other than that referred to in the statute, is upon the defendant. In the present instance, the stranger had no communication whatever with the jury. Their deliberations had proceeded for nearly three hours without even a suspicion of his presence. Upon his discovery, he was brought forthwith before the court, and his misconduct became the subject of brief and incomplete consideration. The hour was late, and the jury had, prior to the discovery, asked for instructions which it was important they should receive before midnight, as the next day was Sunday. It was ascertained that the intruder was a newspaper reporter named Choate. The investigation was necessarily somewhat hurried, and before it was fully terminated the court proceded to instruct the jury upon the subject of their previous inquiry. In this brief investigation, however, the reporter's stenographic notes, taken in the jury-room, were produced and delivered to the court. He was then required to promise not to reproduce from memory, or to publish, what he had heard. This promise he did not give. He hesitated, and expressed reluctance. Without waiting for an affirmative refusal, the court temporarily dropped the subject, and proceeded to instruct the jury, as already stated. The defendants were present. Their counsel were also present, and took part both in the investigation, and in what followed with regard to the instructions called for. They excepted to the instructions given, and requested instructions in another form. Thereupon the jury again retired. No objection was made by the defendants or by their counsel to the further consideration of the case, nor to the rendition of the verdict.

The point upon which the new trial is asked is substantially this: that some of the jurors may have been influenced by the knowledge of Choate's professional character, and by the belief, resulting from that knowledge, and from his refusal to promise secrecy, that their attitude in the jury-room would be disclosed to the public, and that thus they might be subjected to criticism, or unfavorable comment. There is no evidence that any juror was in fact influenced by this incident, or that he gave his adhesion to the verdict because of such consideration. On the contrary, we have a very strong affidavit from all the jurors to the effect that they were not influenced by this incident in the slightest degree, and that they decided the case solely upon the evidence, and the law applicable thereto. Indeed, the affidavit goes so far as to state that the verdict had in fact been agreed upon before the discovery, subject (to quote the expression used in the affidavit of the jurors) "to the definition of law" which had been requested from the court. After the most diligent search, I have been unable to find any case in this state where prejudice to the defendant, as matter of law, has ever been inferred from such circumstances as these, or from circumstances in any way cognate. The rule before the Code was that a verdict would not be set aside unless it clearly appeared that the irregularity or improper conduct had actually influenced the verdict; and it was well settled that, while the affidavits of jurors might be received to support their verdict, they would not be received to impeach or vitiate it. *Dana* v. *Tucker*, 4 Johns. 487. And their affidavits to support the verdict have been received, not only as to facts which came under their observation, but as to the influence of such facts upon their minds. *Baker* v. *Simmons*, 29 Barb. 198. Indeed it was not until the Code Crim. Proc. § 421, that the officers or constables were absolutely forbidden by statute to speak to the jury, or to be present during their deliberations. *People* v. *Hartung*, 17 How. Pr. 88.

:Such conduct on the part of constables was always disapproved; but verdicts were repeatedly sustained notwithstanding their presence in the jury-room, and even when they had actually solicited the jury to render a verdict for one side or the other. In *Taylor* v. *Everett*, 2 How. Pr. 23, it appeared that the ·constable gave the foreman of the jury intelligence that a boy had been ground up in the latter's mill, whereby the juror became so alarmed, and so desirous ·of returning home, that he was induced to agree to a larger verdict than he intended. The supreme court denied a new trial; JEWETT, J., stating that the affidavit of a juror could not be received to prove irregularity or misconduct on his own part, or that of his fellows, and that, rejecting the affidavits ·of the jurors, there was no evidence that the intelligence communicated by the constable influenced the verdict in any respect. The conclusion of the court was that, although the conduct of the constable was deserving of severe ·animadversion, yet the verdict could not be set aside on that ground. In *People* v. *Carnal*, 1 Parker, Crim. R. 256, it was held that a communication made to the jury, while deliberating, by the constable, to the effect that the judge said "they had nothing to do with manslaughter," was not, in the absence of actual prejudice, sufficient to avoid the verdict. The court observed that, while any communication to a jury during their deliberation, made by ·a party in whose favor the verdict was rendered, would avoid the verdict, he knew of no case where such an effect had ever been given to a communication by the losing party, or by a stranger to the controversy; and for the reason, as he supposed, that it would be giving to intermeddlers a power and control over the administration of justice that was denied even to the court. These cases were cited and approved in *Baker* v. *Simmons*, 29 Barb. 199, where the constable urged the jury to give their verdict to the prevailing party. Some of the jurors told him "to be still and mind his own business;" and they all swore that his remarks had no influence upon them, or the verdict which they gave. The verdict was sustained; Judge MASON declaring that it would be a practice rendering very insecure the verdict of the jury, if it were liable to be set aside for every such officious intermeddling of strangers to the controversy; "for the same principle," said the learned judge, "which would set aside the verdict when the constable wrongfully interfered with the jury would also invalidate the verdict when any other person did so." This latter observation was referred to with approval in *Hager* v. *Hager*, 38 Barb. 102. There the subject of the suit was talked of in the presence of the jury by some of the by-standers at the dinner table and bar-room of an hotel, ·and the constable was in the jury-room during their deliberations, frequently ·conversing with the jurors upon other subjects than to ask them if they had agreed upon their verdict. The verdict was sustained; HOGEBOOM, J., closing his opinion with these apt words: "While we should carefully guard the purity of verdicts in our courts of justice, and refuse to sustain them when tainted with any reasonable suspicion of abuse, merely idle or conjectural ·suggestions of prejudice or influence ought not to be listened to. From the very mode of administering justice in our courts, jurors are, in almost every ·case, necessarily, more or less brought into contact with by-standers or ·strangers to the controversy; and we must be careful not to countenance merely fanciful or imaginary notions of prejudice to the parties resulting therefrom." In *People* v. *Hartung*, *supra*, it appeared that one of the jurors inquired of a constable, who was in attendance, whether the jury could not bring in a verdict of manslaughter, stating at the same time that, if they could do so, the whole jury would agree on such a verdict. The constable, in violation of his duty as well as oath, undertook to give his opinion. He said he thought they could, but added that they had better consult their foreman, who, being a justice of the peace, would probably know. The Revised Statutes were subsequently sent for by the jury, and their provisions in relation to the crimes of murder and manslaughter examined. Upon this state

of facts, HARRIS, J., held that, although this was a reprehensible irregularity, and sufficient to vitiate the verdict, yet the question whether injury resulted to the defendant was still an open one. He then examined the latter question, and found that the defendant had not, as matter of fact, been prejudiced by these improprieties; and the verdict was, therefore, upheld. In *Wilson* v. *People*, 4 Parker, Crim. R. 619, the constable handed a juror a paper on which were marked the several punishments fixed by law for the different degrees of manslaughter; yet the court refused to set aside the verdict, it appearing affirmatively that the jury could not have been misled thereby. GOULD, J., said: "The act was unquestionably an irregularity. It was an attempt to do what a jury has no legal right to do,—to render a verdict based on the punishment, not on the truth. But the attempt could have been only in favor of the prisoner. I cannot see how it is possible that the verdict rendered was in any way produced by the information. I am, however, unwilling to lose this opportunity of saying that if jurors cannot learn that they are under oath to ' render a true verdict according to the evidence,' and that they are absolutely bound to take the law from the court, and leave to the law the consequences of a true verdict, the sooner we are rid of the privilege of trial by jury, the better for the community." In *Wilson* v. *Abrahams*, 1 Hill, 207, the cases relating to the misconduct of jurors in civil and criminal trials were reviewed by Judge BRONSON, and the true rule pointed out, viz., that every irregularity which would subject the juror to censure, whether in drinking spirituous liquor, separating from his fellows, or the like, should not overturn the verdict, unless there be some reason to suspect that the irregularity may have had an influence on the final result. See, also, *Bebee* v. *People*, 5 Hill, 34. The later cases are all the same way. The subject of irregularities was carefully considered in *People* v. *Gaffney*, 14 Abb. Pr. (N. S.) 36, and Judge SHELDON's able opinion was approved by the court of appeals. See page 43. There the jury, during their deliberation, became possessed of and read a newspaper containing a report of the trial, but no comments thereon which could prejudice the prisoner. They also had the Revised Statutes in the jury-room, and perused the sections relating to murder and manslaughter. The verdict was sustained, because it was apparent that no injury had resulted to the prisoner.

The authorities under the present Code all follow the old rule, and hold that prejudice, as matter of fact, must be shown. This was explicitly held in *People* v. *Draper*, 28 Hun, 2, where the officers sworn to attend the jury were in the same room with them during their deliberation, and the jury had access to, and read from, law-books relating to the crime under consideration. The cases of *People* v. *Hartung, Baker* v. *Simmons*, and *People* v. *Carnal* were cited as authorities for the proposition that the acts, though irregular, would not vitiate the verdict unless it appeared that the defendant was prejudiced thereby. *People* v. *Menken*, 3 N. Y. Crim. R. 233, is to the same effect. *People* v. *Draper* was cited, and HARDIN, P. J., said: "It has been held in numerous cases that an irregularity which did not prejudice the substantial rights of the defendant would not vitiate the verdict, unless it be shown that the defendant was prejudiced thereby." This case was followed by the same general term in *People* v. *Druse*, 5 N. Y. Crim. R. 23. This was a capital case. One of the jurors separated from his fellows. Upon this, HARDIN, P. J., said: "It is very clear that the juror Babcock, in leaving the Waverley House, where his fellows were kept, in company with an officer, who accompanied him to the Allman House, to pay a bill, did not receive any impressions about the case; and it is clear that the defendant was not prejudiced thereby. That circumstance furnished no ground for disturbing the verdict." And in *People* v. *Kelly*, 94 N. Y. 531, the court said that the recorder was entirely justified in refusing to grant a new trial, although it appeared that he had sent a written communication to the jury in

answer to a written communication of theirs. The reason assigned by the court for this conclusion was that, as the nature of the communication was not disclosed by the record, it not appear that anything transpired which affected the rights of the defendant, or that he was in any way injured thereby.

The cases in some of the other states, notably in Kansas, (*State* v. *Snyder*, 20 Kan. 309,) seem to hold a different doctrine, and require the granting of a new trial whenever the irregularities are such that prejudice might possibly have resulted therefrom. This doctrine is, as we have seen, entirely opposed to the settled law of this state, both before and since the Code. There are certain acts which, under our law, would undoubtedly necessitate a new trial, because of the legal inference of prejudice, such as the appearance of the trial judge in the jury-room, or a private communication between the judge and the jury on the subject of the trial. This results from the commanding influence of the judge, and from the impossibility of estimating the extent of such influence upon jurors who know that he is their absolute guide upon all questions of law. The presence of a stranger or intermeddler in no way connected with the parties, or even of a court officer, is an entirely different matter; and it is not unreasonable that there should be an inquiry as to whether the interference of such a person really exercised any influence whatever upon the jury. If such intermeddling were, *per se* and as matter of law, to require the setting aside of a verdict, it would offer a premium to collusion. A defendant could take his chances of acquittal, with the well-founded hope of a new trial in case of conviction, provided he or his friends could secure some such irregular or improper act on the part of an outsider. Then, too, the good sense and integrity of the jury should count for something. Here, for instance, we spent four days in their careful selection. They were found to be intelligent, impartial, and entirely acceptable. The supposition, or conjecture, unsupported by a *scintilla* of evidence, that such men were affected by the incident under consideration, is a reflection upon their integrity of mind and purpose. Jurors, in these modern days, who are selected only after the most searching inquiries with regard to their fitness, courage, predilection, and surroundings—social, political, and religious—are not the fragile china which defeated parties would have us believe. While even such men should be surrounded with every proper safeguard essential to their independence, impartiality, and purity, they ought not be treated as weak and impressionable children, liable to be swayed by every idle breath or sensational occurrence. Even if the jurors had acknowledged an unworthy timidity, such acknowledgment would have been inadmissible; for, as was said by HARRIS, J., in *People* v. *Hartung, supra,* "if this sanctuary were to be thrown wide open, and an inquisition held upon the conduct of jurors, and the reasons upon which, individually, their verdict was founded, the trial by jury, now held in such sacred regard, could not long survive the dishonor to which it would inevitably be exposed." Nor, in this connection, should we overlook the fact, however little it is to be commended, that the attitude of individual jurors in the final debate rarely escapes publicity. Even when jurors have pledged themselves to mutual silence, their secrets have been wrested from them by the astute inquisitors of the press. The knowledge acquired by this reporter, Choate, was but an accentuation of what each juror might well have supposed would ultimately, in some way, reach the public eye.

But, further, the defendants were aware, at the time of the occurrence under consideration, of every circumstance upon which they now claim legal prejudice. These circumstances then seemed to them so light and trivial, so unlikely to influence the jury in the due consideration of the case, that they made not the slightest objection to the continuance and conclusion of the debate. Nay, more, they requested the court to charge the jury further

upon the law, and thus sought to impress upon the continued deliberations of the jury such additional instructions, and to secure for themselves the benefit thereof. If they believed that they were prejudiced by the occurrence in question, they should then have spoken, and protested against further debate. It is well settled that the defendant cannot observe irregularities, and proceed without noticing them, reserving his knowledge to be subsequently utilized to his own advantage in case the verdict is against him. Thus, where the defendant and his counsel observe that one of the jurors was asleep, but failed to object thereto at the time, a motion for a new trial on that ground was denied. *People* v. *Morrissey*, 1 Sheld. 295. The defendant was not permitted to claim that the verdict was influenced by the sleeping juror's lack of complete information. In *Dayharsh* v. *Enos*, 5 N. Y. 531, the court said that consent, either expressly or by implication, waives all objection to irregularities which occur in the progress of a cause, and that a person may silently acquiesce even in a trial by incompetent jurors. In *People* v. *Clark*, 38 Hun, 217, an affidavit was read to the effect that two of the jurors, while the trial was progressing, were observed reading a newspaper containing a highly sensational account of the trial. The trial court placed upon the record his own statement that the affiant had been engaged during the trial apparently as an associate counsel for the defense. The motion was denied, and the denial was sustained, apparently upon the ground of acquiescence in the reading, and failure to object thereto at the time it was observed. See, also, *People* v. *Reavey*, 4 N. Y. Crim. R. 22, 23; *Wilson* v. *People*, 4 Park. Crim. R. 631; *Fessenden* v. *Sager*, 53 Me. 531, 536; *State* v. *Daniels*, 44 N. H. 383; *Lyman* v. *State*, 69 Ga. 404; *Hunter* v. *State*, 43 Ga. 484, 524; *Harrington* v. *State*, 76 Ind. 112. The principle, as well stated in *Fox* v. *Hazelton*, 10 Pick. 275, is that a party cannot "take his chance for a favorable verdict, reserving a power to impeach it, should it happen to be against him; a proceeding inconsistent with the plain principles of fair dealing and with the frankness which ought to characterize the whole course of judicial proceedings." This doctrine should be rigidly applied to a defendant in a criminal case, for the reason that a verdict in his favor cannot be set aside, and that the people, upon an acquittal, are remediless.

Upon both grounds, therefore, the motion should be denied: *First*, upon the ground that the verdict was not influenced in the slightest degree by the incident under consideration; *second*, that, if the defendants believed that that incident either in fact tended to prejudice, or in law did prejudice, their substantial rights, they should not have speculated upon an acquittal, but should at the proper time, and when fully advised of the facts, have insisted upon a discharge of the jury. For these reasons the application must be denied.